UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JIMMY RAY EPPS,

        Petitioner,

v.                                 Case No. 3:20-cv-318-TJC-MCR

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

        Respondents.

_____

## ORDER OF DISMISSAL WITH PREJUDICE

### I.    Status

Petitioner, an inmate of the Florida penal system, initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 1) on March 24, 2020.[1] He also filed a Motion to Consider Actual Innocence to Cure Petitioner's Procedural Default (Doc. 2), which the Court construed as argument in support of his Petition (Doc. 3). He challenges a 2001 state court (Putnam County, Florida) judgment of conviction for first degree murder of Amos Brown and attempted first degree murder of Rashad Medlock. Petitioner is serving life in prison. Respondents filed a

---

[1] The Court uses the date Petitioner certified that he placed the Petition in the prison mailing system. Doc. 1 at 16.

Response (Doc. 8), with exhibits (Doc. 10; Resp. Ex.), arguing that this case is untimely filed and should be dismissed with prejudice. Petitioner filed a Reply (Doc. 13).[2] This case is ripe for review.[3]

## II.    One-Year Limitations Period

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) amended 28 U.S.C. § 2244 by adding the following subsection:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[2] In his Reply, Petitioner attempts to "amend" his Petition to add his motion to interview jurors that he filed in state court after he initiated this case. See Doc. 13 at 3. However, requests for affirmative relief must be made in a motion. See Fed. R. Civ. P. 7(b) ("A request for a court order must be made by motion."); see also Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." (quotations and citation omitted)). Thus, Petitioner's request to amend his Petition is improper and the Court declines to consider it.

[3] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The Court finds that "further factual development" is unnecessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

### III.   Analysis

Following a jury trial, the state court entered judgment against Petitioner on March 15, 2001. Resp. Ex. 1 at 312-19. Petitioner appealed, and the Fifth District Court of Appeal per curiam affirmed Petitioner's judgment and convictions without a written opinion on March 26, 2002. Resp. Ex. 7. The

mandate issued on April 12, 2002. See Epps v. State, No. 5D01-898 (Fla. 5th DCA).

Petitioner's judgment and sentence became final on June 24, 2002, which is 90 days after the Fifth DCA's per curiam decision. See Clay v. United States, 537 U.S. 522 (2003); Close v. United States, 336 F.3d 1283, 1285 (11th Cir. 2003) ("According to rules of the Supreme Court, a petition for certiorari must be filed within 90 days of the appellate court's entry of judgment on the appeal or, if a motion for rehearing is timely filed, within 90 days of the appellate court's denial of that motion." (citing Supreme Court Rule 13.3[4])). The next day, June 25, 2002, Petitioner's federal one-year limitations period began to run, and it ran for 275 days until it was tolled on March 27, 2003,[5] by the filing of Petitioner's counseled motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. Resp. Ex. 9 at 1-11. Petitioner twice amended his motion. Id. at 32-43, 67-76. After holding an evidentiary hearing, the circuit court denied the motion on November 15, 2004. Id. at 86-88. Petitioner, through counsel, appealed the denial of his Rule 3.850 motion, and the Fifth DCA per

---

[4] See Sup. Ct. R. 13.3 ("The time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate.").

[5] The prison date stamp reflects that Petitioner mailed the motion, presumably to his counsel, on March 27, 2003. Resp. Ex. 9 at 1. Counsel completed the certificate of service on April 1, 2003, and the motion was filed with the clerk on April 4, 2003. Id. at 1, 6. Because it makes no difference in the outcome, the Court uses the date Petitioner signed the motion.

curiam affirmed the denial without a written opinion and issued the mandate on October 28, 2005. Resp. Exs. 13, 14; see Epps v. State, No. 5D05-837 (Fla. 5th DCA). The next day, October 29, 2005, Petitioner's one-year limitations period continued to run for 90 days until it expired on January 27, 2006. Petitioner filed the instant case on March 24, 2020—more than 14 years after his one-year limitations period expired.

Petitioner recognizes that his Petition is untimely. See Doc. 1 at 14-15. He does not argue that he is entitled to equitable tolling. Instead, he argues that the state court's decision denying his claim that his trial counsel was ineffective for failing to consult with him when deciding not to discuss any lesser-included offenses with the jury and his claim relating to newly discovered evidence was "patently unreasonable." Doc. 2 at 2.[6] Petitioner includes an affidavit that summarizes the "proffered testimony" of himself, Ronnie Maples, Kearfer Medlock, Rashad Medlock, a Ballistics Expert, and a Forensic Expert. Id. at 5-20. He claims that this evidence shows he is actually innocent and thus his failure to comply with the one-year limitations period should be waived. See Doc. 13; see also Doc. 1 at 14-15.

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or, as in

---

[6] These are the same two grounds that Petitioner raises in the Petition. Doc. 1 at 5-8.

this case, expiration of the statute of limitations." <u>McQuiggin v. Perkins</u>, 569 U.S. 383, 386 (2013). To avoid the one-year limitations period based on actual innocence, a petitioner must "present new reliable evidence . . . that was not presented at trial" and "show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt in light of the new evidence." <u>Rozzelle v. Sec'y, Fla. Dep't of Corr.</u>, 672 F.3d 1000, 1011 (11th Cir. 2012) (quotations and citations omitted); <u>see</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (finding that to make a showing of actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt").

In his affidavit, Petitioner avers that at the end of 2001 or beginning of 2002, while he was housed at Taylor Correctional Institution, he was approached by inmate Ronnie Maples, who claimed that he saw Tyree Belton murder Amos Brown.[7] Doc. 2 at 5. He also states that later, while still housed at Taylor CI, Kearfer Medlock, the brother of attempted murder victim Rashad Medlock, approached Petitioner and explained that "everybody knows" Petitioner was not the shooter. <u>Id.</u> at 6. Kearfer allegedly told Petitioner that Belton admitted to Kearfer that Belton murdered Brown and shot Rashad by

---

[7] Belton was initially arrested for the murder of Brown and attempted murder of Rashad. <u>See</u> Resp. Ex. 2 at 684-91 (Lieutenant Griffith testifying that Belton was originally arrested on these charges, but after further investigation, the charges were dropped).

accident. <u>Id.</u> Kearfer obtained an affidavit from Rashad which confirmed that prior to Petitioner's trial, Rashad had been attempting to say that the shooter was black, but the prosecutor (Gary Woods) threatened Rashad to keep his mouth shut. <u>Id.</u> at 7.

Petitioner further avers that in 2017, he met Rashad at Calhoun Correctional Institution. <u>Id.</u> at 7-8. Rashad told Petitioner that Petitioner needs to "'do another appeal'" and Rashad would make a statement on Petitioner's behalf once Rashad was out of prison. <u>Id.</u> at 8. Petitioner explains that Rashad's testimony would show that the prosecutor threatened Rashad at Petitioner's trial and postconviction evidentiary hearing to keep Rashad from telling the truth—which was that a black male (Petitioner is white) shot Brown and Rashad. <u>Id.</u> at 8-10.

Attached to Petitioner's original Rule 3.850 motion are affidavits from Maples, Rashad, and Kearfer. <u>See</u> Resp. Ex. 9 at 7-11.[8] Maples avers that he saw a "stre[a]k of fire come from the passenger side of the car" and he heard a "loud boom." <u>Id.</u> at 7. He also states that he "saw a black man still leaning out the window with something in his hands." <u>Id.</u> In Rashad's affidavit, he states that he told an officer several times that a black male shot him. <u>Id.</u> at 9. He indicates that he "wanted to testify [o]n [Petitioner's] behalf during his trial,

---

[8] The affidavits of Maples and Kearfer are also attached to the Petition. <u>See</u> Docs. 1-1, 1-2.

but [he] was threaten[ed] by D.A. Gary Woods." Id. He concludes that Petitioner

was not the shooter. Id. Finally, Kearfer's affidavit reflects that Belton admitted

to Kearfer that Belton was the shooter. Id. at 10.

Notably, in Petitioner's counseled second amended Rule 3.850 motion,

which Petitioner also signed under penalty of perjury, Petitioner argued:

> The evidence was overwhelming that Defendant
> committed an act but to not argue for a lesser included
> offense was ineffective assistance of counsel. Defense
> counsel was faced with a virtually unwinnable case, but
> a viable lesser offense. All of the people in the car were
> intoxicated and rowdy. In this delirium they got into a
> vehicle with a gun. If anyone had been shot, they didn't
> know it. That translates into a manslaughter
> conviction, not first degree murder.

Id. at 74-75. The postconviction court held an evidentiary hearing, at which

Maples testified. See id. at 86. The court then denied the motion, finding, in

part, that Maples' testimony was "inherently unreliable," and that in light of

the testimony presented at trial, Maples' testimony "offer[s] no exculpatory

evidence" for Petitioner. Id. at 87. The postconviction court also noted that

Petitioner withdrew his claims of newly discovered evidence based on the

statements of Kearfer and Rashad, but the court alternatively denied the claims

finding that Petitioner "failed to meet his burden regarding the statements of

either Kearfer or Rashad Medlock." Id. at 86.

Regarding Petitioner's proffered expert testimony to show his actual

innocence, Petitioner claims that the state's ballistics expert at trial "described

that the number of pellets found in the victims were too many to have been fired from one single cartridge," and that given the testimony regarding the locations of the shooter and the victims, "the spread was too wide." Doc. 2 at 15. According to Petitioner, "[w]hat their expert didn't say was that in order for the shotgun in evidence to have been the one used at the shooting, the shooter would have had to be about 100 yards down that road – which would be outside of the lethal range of the shotgun." Id. at 15-16. Petitioner claims that he needs a ballistics expert to explain "that one single shot or 'boom' with the shotgun in evidence would not have expelled that many pellets and would not have created a spread width that wide from where the shooter was witnessed firing his weapon at Amos Brown and Rashad Medlock." Id. at 16. Petitioner also asserts that while the state's forensic expert testified that no gunpowder residue was found in Petitioner's car, he wants to present testimony from a forensic expert "that, all things considered, the upholstery [in Petitioner's car] should have been covered in copious amounts of GPR, and that – in their opinion – [Petitioner's vehicle] was not the car" from which the shot was fired. Id. at 18.

Petitioner has not offered any new reliable evidence to sustain an assertion of actual innocence. He largely rehashes the testimony given at his trial. Indeed, evidence was presented at trial regarding the different identifications of the vehicle used in the shooting, the race of the individuals in that vehicle, and the gunshot residue and importance of the "spread." During

9

closing arguments, Petitioner's defense counsel referred to the shotgun pellets

and the spread:

> And the interesting thing is no pellets are recovered. And you've heard testimony - - you've heard the testimony about the spread and how gunshot works. But there is no pellets anywhere. Not on the ground. Not anywhere at the scene. No wadding. No shells. And you need to play [sic] close attention to the wounds on Medlock and Brown. And look at that, establish the spread. Use your common sense.

> Could the victims have been standing as described by Medlock and Robinson and Daniels? Are the injuries consistent with one shot?

> Now, it's just a little confusing.

> We've got an expert who says if this was a 20-gauge shotgun and you're using Number Three buckshot, the maximum - - the maximum that you can load the shell into a 20-gauge is a shell with 20 pellets. Yet, we have nine pellets into Mr. Medlock, 13 pellets into Mr. Brown, and one or two, maybe, into Mr. Daniels. Any way you count them, it comes up to 23, 24 pellets.

> Ladies and Gentlemen, does that mean that this was not a 20-gauge that was used, but a different gauge? And what type of ammunition was actually used? Was it self-loaded ammunition? Was it manufactured? Was it, as the State - - I don't know whether they're trying to get you to assume that - - was it the same type of ammunition that was found with the gun they found at Robert Adkins' house under the sofa? Was it Federal, Winchester, Remington? Do we know? And do we even know, where is the shotgun that was used to shoot Medlock and Brown? What gun was used? What ammo?

Resp. Ex. 2 at 1126-27; see id. at 1132-33 (reiterating to the jury the importance

of considering the spread). Defense counsel also pointed out the discrepancies

in the testimony regarding the color of the vehicle and race of the shooter:

> And [Rashad Medlock] tells you, it was after
> midnight that this white Ford, or what it - - later he
> told Officer Zike it was a gray Trans Am. He told
> Lieutenant Harper it was a gray Trans Am with four
> black males in it, came - - first came by the house. And
> then he said that same vehicle returned about three.
> So we are talking about from midnight to three,
> according to him.[9]
>
> Mr. Robinson says it was a gray car. And he says
> there were at least two white males in it and one
> female. Now, if we're talking about the same - - if we're
> talking about Jimmy Epps and the same group of
> people - - if we're talking about the same car being the
> car that Mr. Robinson admits that he went up and
> didn't hit someone, maybe slapped them, or maybe
> unintentionally got his hand knocked into the person
> as they pulled away in this gray car - - where is the
> female?
>
> . . . .
>
> Mr. Daniels testified. It was a gray car, after
> midnight, returned 30 minutes, at max, 40 minutes
> afterwards. . . . He saw the gun that was used. A
> sawed-off shotgun.
>
> . . . .
>
> The State would have you jump to some sort of
> conclusion that the gun that they have kept parading
> around here is the gun that was used. And if you will

---

[9] On cross-examination, Rashad denied ever telling anyone that a black person had
shot him. Ex. 2 at 546.

>         recall, I asked Mr. Daniels, is that his interpretation
>         of a sawed-off shotgun? And he said no.

Id. at 1130-31; see id. at 1138 (defense counsel summarizing Lieutenant Griffith's testimony: "And he had a description of a white, gray, beige, tan vehicle. Blue is close enough for him.").

Detective Lassiter testified that he did not know whether there was any gunshot residue found in Petitioner's vehicle. Resp. Ex. 2 at 650. Lieutenant Griffith testified that he did not find any gunshot residue, discarded casings, or waddings in Petitioner's vehicle. Id. at 719. Allen Miller, a Senior Crime Laboratory Analyst with the Florida Department of Law Enforcement, testified that "it's not uncommon not to find" any gunshot residue on the door of a vehicle. Id. at 1024, 1028.

Petitioner's brother testified that he was with Petitioner at the time of the shooting, and that before Petitioner shot the gun, he said, "Hey, ni\*\*er." Resp. Ex. 2 at 801-02, 807. Testimony was also presented that before the shooting, Petitioner stated multiple times, in essence, that he was going to kill a ni\*\*er, and after the shooting, he stated that he (or we/they) had shot or killed a ni\*\*er. See id. at 395, 415, 450-51, 472-74, 476, 491, 495, 513, 732, 759-60, 799. Petitioner testified on his own behalf, denying that he ever shot a shotgun on the date in question and trying to point the blame on his brother. See id. at 1038-40; see also id. at 1064-65 (testifying that his brother shot at a black male

12

in East Palatka that evening, but they did not travel to the part of Palatka where Brown and Rashad were shot). He also denied telling anyone that he was going to kill a ni\*\*er or that he/they had shot a ni\*\*ger. See id. at 1055, 1056, 1057, 1059, 1060, 1061.

Upon review, this Court finds that Petitioner simply wants to remold the testimony that was provided at trial. However, the jury considered that testimony and found Petitioner guilty. Notably, in his Rule 3.850 proceeding, Petitioner acknowledged, under penalty of perjury, that he was not guilty of first-degree murder, but instead, he was only guilty of manslaughter.[10] "It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998); see Rozzelle, 672 F.3d at 1015 (deciding "that the narrow and extraordinary nature of Schlup's actual innocence 'gateway' does not extend to petitioners . . . who did the killing and whose alleged 'actual innocence' of a non-capital homicide conviction is premised on being guilty of only a lesser degree of homicide").

When Petitioner's "newly discovered evidence" is considered along with the testimony and evidence presented at trial, it cannot be said that it is "more

---

[10] While defense counsel did not argue for a lesser-included offense during closing arguments, the jury was instructed on the lesser-included crimes for first degree murder and attempted first degree murder, including manslaughter and attempted voluntary manslaughter. See Resp. Ex. 2 at 1179-89.

likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt in light of the new evidence." <u>Rozzelle</u>, 672 F.3d at 1011. Petitioner has failed to show that he is entitled to the "exceedingly narrow" actual innocence exception. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

Accordingly, it is

**ORDERED**:

1.      This case is **DISMISSED with prejudice** as untimely.

2.      If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[11]

---

[11] The Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

3.      The **Clerk** shall enter judgment dismissing this case with prejudice as untimely, terminate any pending motions, and close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 9th day of December, 2022.



TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 11/28
c:
Jimmy Ray Epps, #J05338
Counsel of Record

15